## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN KENNEL )
                            )    C.A. No. _____
          Plaintiff, )
                            )
v. )
                            )    TRIAL BY JURY OF TWELVE
DELAWARE DEPARTMENT OF )    DEMANDED
NATURAL RESOURCES AND )
ENVIRONMENTAL CONTROL )
                            )
                            )
         Defendant. )
                            )

## COMPLAINT

## NATURE OF THE ACTION

    1.    This action arises from the unfair and unlawful employment practices by the Defendant, Delaware Department of Natural Resources and Environmental Control ("DNREC"), that violated the rights of John Kennel ("Plaintiff") afforded him under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., and the Delaware Persons With Disabilities Employment Protections Act ("DPDEPA"), 19 Del. C. §§720-728.  Plaintiff, who was employed as a planner DNREC for nearly 29 years, is a member of a protected class because of his disability and diagnosis of autism.

    2.    In 2017, an administrative shakeup and change in leadership at the Department led to the installation of a new Secretary and supervisory chain of command under which Plaintiff was a direct report.  Under this new regime, Plaintiff suddenly began receiving poor performance reviews and negative commentary that was predicated upon his traits associated with his autism. Plaintiff, whose role as a Planner IV for DNREC involved his service as State Coordinator of the

Delaware Estuary program, had never before received poor performance reviews during the entirety of his decades-long tenure. As a result of discrimination and harassment perpetuated by Plaintiff's supervisors, a pervasive and hostile atmosphere developed in the workplace and interfered with Plaintiff's ability to do his job.

3.     Plaintiff filed a complaint with the Equal Employment Opportunity Office ("EEOC") on September 14, 2018. He continued to face harassment, discrimination, and retaliation including numerous adverse employment actions in the form of discipline.

4.     On September 4, 2019, EEOC issued a Right to Sue Letter based upon a finding of probable cause that DNREC had engaged in discriminatory acts. This Complaint followed.

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction over these claims brought under the ADA pursuant to 42 U.S.C. §§12101, *et seq.*

6.     This Court has ancillary jurisdiction over Plaintiff's state law claim under 28 U.S.C. §1367.

7.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff's residence, Defendant, and Defendant's principal office is located in this District, and all conduct upon which the claims in this Complaint are alleged occurred in this District.

## THE PARTIES

8.     Plaintiff is a citizen of the United States and of the State of Delaware, and at all times relevant to the events described in the Complaint has resided in New Castle County, Delaware.

9.     On information and belief, Defendant Delaware Department of Natural Resources and Environmental Control is a State agency and is located at 89 Kings Highway, Dover, DE 19901.

## ADMINISTRATIVE PROCEEDINGS

10.     Plaintiff filed a formal Complaint *pro se* before the EEOC on September 14, 2018.

11.     On September 4, 2019, the EEOC issued a Right to Sue letter based on its Determination and finding of Probable Cause to believe DNREC had engaged in discriminatory acts against Plaintiff on the basis of his disability.

12.     Plaintiff, by and through separate counsel, is currently engaged in administrative proceedings before the Delaware Merit Employee Relations Board regarding alleged violations of the state's Merit Rules.  A date for the final hearing has not yet been set.  Efforts to vindicate Plaintiff's rights under the Merit Rules need not be exhausted prior to the pursuit of the relief contemplated herein.

## FACTS

13.     Plaintiff has been employed by DNREC since 1990.  Over the years, he worked his way up to the position of Planner IV, a position that he has held since 2003 until his termination in October 2019.  His salary at the time of his termination was $55,806.40 per year.

14.     As a Planner IV, Plaintiff's role at DNREC included serving as State Coordinator for the Estuary Program.  This job required him to remain in close contact and communicate with key partners from different states to further the mission of the Department.  This included senior members of other Delaware State agencies, as well as corollary members of interstate departments abutting the Delaware River and Estuary region.

15.     For the vast majority of his career at DNREC, Plaintiff has been treated with the respect he deserves as a person with superior intellect and technical knowledge, even though he is on the Autism Spectrum.  Throughout his adult life, Plaintiff has been appropriately and actively engaged in medical and therapeutic maintenance for his disability.  These interventions have allowed Plaintiff to serve in a highly skilled, technical professional capacity with DNREC for nearly three decades.  Plaintiff's disability does cause him to have "quirks" that he acknowledges exist, but that have not historically interfered with his ability to work and remain a productive member of society.

16.     The State of Delaware and DNREC has been on notice of Plaintiff's diagnosis and disability since at least 2010.  Both before and after Plaintiff decided to disclose his condition, he was treated with respect and recognition as a human being and a skilled professional, notwithstanding his disability.  On occasions where accommodations were needed to enable Plaintiff to perform certain job functions, reasonable workplace accommodations were afforded to Plaintiff that allowed him to continue working and building a thriving career with DNREC.

17.     As he grew more seasoned in his tenure, the negative symptoms of Plaintiff's autism seemed to subside.  This was due in part to Plaintiff's satisfaction from the respect and rapport he had built up with his peers and supervisors, which gave him the necessary confidence to sustain a productive working routine.  This culture of respect from his supervisors and peers was a key piece of the dynamic that led to Plaintiff's professional success and longevity, and that minimized the disruptive aspects of his disability.

18.     In 2017, a change in the senior administration and leadership at DNREC caused a personnel change in Plaintiff's chain of command.  Plaintiff's immediate supervisor was to be Bob Scarborough ("Scarborough").  One step above was the administrator, Kimberly Cole ("Cole").

4

19.     Following the leadership change in 2017, there was palpable shift in the culture of respect and decency that Plaintiff had come to expect during the long course of his career. Plaintiff was suddenly confronted with increasingly hostile and derogatory behavior and language from his supervisors, specifically Scarborough and Cole. Their actions and attitude toward Plaintiff set the "tone at the top" for a culture of ridicule, derogatory and demeaning language, and set in motion the sequence of events that ultimately gave rise to this lawsuit.

20.     Under the new leadership team, Plaintiff was harassed, disrespected, and marginalized by his new chain of command, including Scarborough and Cole, which eroded the decades of progress toward building confidence and gaining the trust of his peers and others with whom he needed to interact as part of his ordinary job functions. A coworker who was classified as an Environmental Specialist, Bonnie Arvay, began to mimic the attitude toward Plaintiff that had been demonstrated by Cole and Scarborough. This caused Plaintiff to believe that Cole's and Scarborough's conduct had undermined his own credibility among his peers and had become insidious and pervasive.

21.     Plaintiff had been, and remained, under the care of a team of medical and mental health providers to help him manage to lead a normal, productive life to the extent possible while coping with his first diagnosis in 2003. Plaintiff shared the stressors at work involving his new, intolerant management team with his medical providers. It became clear that the increasingly hostile pattern of derogatory and demeaning behavior exhibited by his superiors had the effect of exacerbating Plaintiff's symptoms of his diagnosis with autism. The onslaught of stress at his job made it more difficult for Plaintiff to manage the ordinary, every-day challenges he faces as a person with his particular disability. The relentless pressure that was suddenly placed on him by Scarborough and Cole gave Plaintiff such serious and acute distress that disrupted his personal life

and effected relationships and his ability to take enjoyment from ordinary activities that had previously brought him pleasure and solace. As Plaintiff's level of stress increased, the symptoms of his autism would flare or become more acute, thus leading to even more conflict in the workplace.

22.     In an attempt to de-escalate the situation at work, Plaintiff approached Cole to address what he felt was Scarborough's bad temper, issues with anger, and particular hostility toward him. On one occasion, Cole told Plaintiff that Scarborough had been told before that he needed to accept people the way they are.

23.     By mid-2017, the Scarborough was actively thwarting Plaintiff's attempts to continue his employment by undermining him and setting unreasonable expectations that were inconsistent with his prior work and difficult given his particular diagnosis. Cole did nothing to intervene, and when Plaintiff sought to go to even more senior administration officials for help, Cole and Scarborough became even more vicious and retaliatory toward him.

24.     In August 2017, Plaintiff received a written reprimand regarding his workplace conduct. This was the first of what would become several "sham" writeups, insofar as they were baseless and generated with the particular purpose to create a paper record that would later serve DNREC's justification to discipline and later terminate him. The August 2017 write-up had to do with Plaintiff's communication with intrastate actors and interstate agencies concerning planning and projects that were to occur along the Delaware River in areas proximate to Pennsylvania. Up until this time, it was an expected part of Plaintiff's employment to have such communications, but Scarborough abruptly eliminated Plaintiff to make such communications personally, and instead insisted that all of Plaintiff's work product and communications be passed through him. This frustrated the ordinary flow of Plaintiff's productivity and unnecessarily interfered with his

ability to timely carry out the essential functions of his job. There was no valid explanation, nor a non-discriminatory purpose offered, for Scarborough's unilateral decision to alter this aspect of Plaintiff's role at DNREC.

25.     The August 2017 reprimand marked the beginning of a series of escalating discriminatory acts that involved the changing, narrowing, and eliminating Plaintiff's job functions and authority.

26.     On one occasion during the summer of 2017, Plaintiff took his concerns to the Secretary of the Department, Shaun Garvin, and explained how Scarborough and Cole had been undermining him by giving him a "hard time" about his disability. Evidently, Scarborough and Cole became aware that Plaintiff had attempted to go "over their heads." Scarborough would later tell Plaintiff that "he [the Secretary] doesn't care about you" in an effort to dissuade Plaintiff from vocalizing his concerns any further.

27.     Around this time, Plaintiff was looking for ways to demonstrate his value in the workplace, in a good-faith effort to appease the new leadership and regain some of the respect he had previously enjoyed. For example, Plaintiff expressed a desire to mentor younger DNREC employees, and this request was approved. Plaintiff openly discussed his desire to be promoted to Planner 5, which is a step level above the one he had been designated since 2003. During the previous leadership regime, his aspirations were met with positive feedback and encouragement. But during his annual performance review for the 2017-18 year, Cole's response to Plaintiff's request was to laugh in his face.

28.     Plaintiff brought up Cole's laughter to Scarborough, again in an attempt to contain the issue and minimize further embarrassment. For a period of time, Cole seemed to recognize the

impropriety of her actions.  But Scarborough would soon escalate the same pattern of behavior, such that Plaintiff experienced little reprieve from the daily stress and torment.

29.    On at least one occasion, while Scarborough was yelling at him in a verbally abusive manner and tone, Plaintiff soiled himself.

30.    Plaintiff's annual performance evaluation in 2018 was the first time in his decades-long tenure that he received poor marks on the various categories at issue.  During the course of his supervisory interview on the topic of his evaluation, Plaintiff again disclosed that he had an autism diagnosis, as he had done previously in 2010.  Doing so did nothing to dissuade Scarborough from continuing his campaign of harassment and retribution against Plaintiff.

31.    On or about March 16, 2018, Scarborough told Plaintiff that he cared too much about his job, that he was not doing things the way he and Cole "like it," and that he talked too much.  Plaintiff explained that his ability to process information auditorily as opposed to visually or from reading e-mails improved his comprehension.  As a result, Plaintiff had always preferred to speak via phone or in person to key players including leadership from other State agencies and responding out-of-state actors.   Plaintiff had never previously been told not to engage in communications as he had done.

32.    The incident in March 2018, like others, caused Scarborough to raise his voice and to shout at plaintiff.  In this instance, Scarborough threatened Plaintiff with termination.   The subsequent disciplinary response from Scarborough and Cole was to strip Plaintiff of his role as State Coordinator.  He was also informed that, as a result, he was no longer eligible to be re-classified as a Planner V.

33.    During the spring and summer of 2018, Plaintiff sought additional care from his medical team to address symptoms such as stomach pains due to the stressful situation at work.

He had bouts of depression based on the feeling of being overwhelmed and facing an impossible battle for acceptance at work.  His blood pressure was also consistently higher than normal.  He experienced back pain, which required him to sleep with a heating pad, and frequently felt exhausted.

34.     During the preceding months and those that followed, Plaintiff had been applying for other job postings within the Department, but was not hired despite meeting the minimum qualifications for several of them.

35.     In the summer of 2018, Plaintiff, with the help of his wife, put together am accommodations plan in an attempt to calibrate to the peculiarities of the Scarborough and Cole regime, while taking into account Plaintiff's disability-related needs.  In July 2018, Plaintiff made contact with and sent the accommodations request form to Human Resources Specialist Judy Cook ("Cook"). Later that month, Cook inquired as to whether Scarborough had exhibited any signs of "improvement" in terms of his attitude toward Plaintiff.  Plaintiff candidly told her that Scarborough had not changed his coarse, vulgar, and nasty behavior.

36.     In July 2018, Plaintiff became aware that Andrea Kriener, Director of Climate, Coastal and Energy for the Agency had given Cole a direct order to cease and desist from harassing Plaintiff in violation of federal and state law.  Sometime in Spring 2019, Plaintiff would again approach Ms. Kriener in an attempt to clear his disciplinary record and "right the ship."  She responded with a letter acknowledging his good work and the positive role he played in the program.  She also attended a meeting with Plaintiff, Scarborough, and an autism patient advocate.

37.     In September 2018, Plaintiff filed his complaint with EEOC alleging discrimination and workplace harassment on the basis of his disability.

38.     At the urging of Human Resources personnel, Plaintiff began attending vocational rehabilitation through the Delaware Division of Vocational Rehabilitation, although he felt insulted and disrespected by this request, because it essentially "missed the point." Plaintiff complied because he remained hopeful that the conflicts at work could be resolved and that he could achieve his pension at 30 years with the Department and retire.

39.     In March 2019, the State, through the vocational rehabilitation program, requested a full psychological evaluation, which made Plaintiff feel demeaned and insulted, as though his long-term diagnosis and treatment for autism was now being called into question.  This further chilled his desire to press forward with his legitimate claims of discrimination and retaliation, but Plaintiff agreed to a release of his medical records in the interest of transparency.

40.     In early 2019, Plaintiff received his annual performance review for the preceding calendar year.  Again, the evaluation was critical of his job performance based on characteristics that he cannot control due to his medical diagnosis of autism.

41.     On April 23, 2019, Plaintiff was placed on a Performance Improvement Plan ("PIP").  The specific issue was purported to be Plaintiff's lack of progress on a project called Delaware Municipal Resiliency that had been assigned to him in July 2018.  It set forth five goals and specified dates by which they ought to be completed.   The work required Plaintiff to provide a final written work product describing the project, procedures, information gathered, and recommendations for each of Delaware's 57 towns and municipalities by June 24, 2019. The placement on the performance improvement plan was dubious, as Plaintiff's most recent performance review indicated a "meets expectations" rating.  The State's own rules governing its treatment of employees in this context, the Merit Rules, delineate the requirement that employees

be placed on such plans only subsequent to receiving a lower performance rating. Placing Plaintiff on this plan in plain derogation of the State's own rules constitutes a further act of discrimination.

42.     On or about June 26, 2019, Plaintiff was formally suspended from his position at DNREC.  He received a letter outlining the basis, including alleged failures to meet his PIP, from Dayna Cobb, Division Director of Climate, Coastal and Energy.  The letter informed him of his right under the Merit Rules to a pre-decision meeting, but that the Department was recommending his termination at that time.  During the meeting at which Plaintiff was presented with this letter, the DNREC representative present attempted to compel Plaintiff to resign from his position rather than having his separation from the department processed as a termination of employment. To effectuate this forced resignation, DNREC representatives advised Plaintiff that he would not be permitted to take a break during the course of the meeting, suspended his key card's access to the building prior to conducting the meeting, refused to permit Plaintiff to go to his office and retrieve certain important items related to his prior career in the military, used words to the effect that Plaintiff "was either going to resign or that they would make the decision for him," and also pushed Plaintiff to resign by asserting that the only way he could recover his paid time off in full would be if his separation were to be processed as a resignation. Tellingly, at no point during this meeting did DNREC advise Plaintiff that resigning would prevent him from pursuing relief through the state's grievance process, effectively extinguishing one of Plaintiff's tools to contest his unlawful termination. Subsequent to this meeting, although Plaintiff indicated that he did not wish to retire and rather wished to return to work, DNREC nonetheless processed Plaintiff's separation from employment as a resignation. This occurred even though Plaintiff requested a pre-decision meeting shortly after being provided with the letter noted in this paragraph. Weeks after improperly

attempting to force Plaintiff to retire ending Plaintiff's bi-weekly salary payments, DNREC reversed course and placed Plaintiff on administrative leave pending a pre-decision meeting.

43.     A pre-decision meeting took place on October 10, 2019.  Plaintiff provided a prepared statement, and the presiding official was Lisa Borin Ogden, the designee of Secretary Shawn Garvin.

44.     On October 29, 2019, Secretary Garvin issued a letter to Plaintiff stating that he was to be terminated.  The letter sets forth the arguments that Plaintiff raised in his written statement at the pre-decision meeting with Ms. Ogden, but fails to provide any substantive evaluation of those arguments or acknowledge even that Plaintiff has a diagnosis of autism. Rather, the letter makes passing reference to his "dyslexia" and pointedly remarks that Plaintiff had, by that point, filed a claim with the EEOC.

45.     Secretary Garvin's letter concludes by stating that he made "careful consideration" of the information from the October 10, 2019 pre-decision meeting, but agreed with the recommendation by Dana Cobb in her July 29, 2019 letter to terminate Plaintiff.  Secretary Garvin's rationale is not apparent on the face of the letter.  Rather, it merely points out that his termination was the result of "performance issues, not discrimination or retaliation."  It further mischaracterized Plaintiff's own statements regarding the accommodations he would need and that had been provided to continue carrying out the essential functions of his position.  The letter concludes that Plaintiff failed to provide a "compelling reason" why he should not be terminated.


## COUNT I: EMPLOYMENT DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §12101, *et. seq.*


46.     All preceding paragraphs are fully incorporated herein.

47.     Plaintiff has been the victim of intentional, unlawful discriminatory actions by his supervisors at DNREC.   At all times relevant to the Complaint, Defendants were aware of Plaintiff's status as a member of a protected class due to his disability, autism.  Plaintiff's disability was a determinative factor in Defendant's pattern of derogatory, demeaning conduct, as well as taking adverse employment actions against him up to and including wrongful termination.

48.     Defendant invented disciplinary infractions, placed Plaintiff on a performance plan that was designed for failure, and placed him on involuntary leave without due process, before ultimately terminating him.   These actions were taken with the intent to discriminate against Plaintiff in violation of his rights under federal law.

49.     Defendant failed to comply with the provisions of the ADA requiring employers to engage in an interactive dialogue and to provide reasonable accommodations to persons like Plaintiff whom federal law regards as a protected class.   At all times relevant to the Complaint, as evidenced by his prior decades of satisfactory service, Plaintiff was qualified to perform the essential functions of his job.  Defendant was aware of its obligation to reasonably accommodate his disability.  Defendant's failure to provide such accommodation is a violation of the ADA and Plaintiff's rights.

50.     Plaintiff has been made to suffer mental anguish and emotional distress, loss of wages and benefits, elimination of job functions of authority, suspension from employment, and ultimately loss of employment and future employment opportunities, as a direct and proximate result of Defendant's violations of his statutory rights as alleged herein. Plaintiff is entitled to the rights and remedies provided by law including statutory and compensatory damages, compensation for lost wages, costs, pre-judgment interest, and reasonable attorney's fees.

## COUNT II: HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §12101, *et. seq.*

51.     All preceding paragraphs are fully incorporated herein.

52.     Plaintiff was subjected to harassment by his supervisors in the workplace, and this harassment was motivated by Plaintiff's disability.  The harassment included verbal threats, shouting, bullying, and demeaning Plaintiff because of the nature of his disability, causing Plaintiff extreme physical and emotional distress.    Defendant's conduct was not welcomed by Plaintiff. Defendant's conduct was so severe and pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.  Plaintiff believed his work environment to be hostile and abusive based on the conduct of his supervisors and the culture of harassment and disrespect perpetuated by them in the workplace.

53.     Plaintiff suffered adverse, tangible employment actions as a result of the hostile work environment.  He was given a written reprimand, stripped of his title as State Coordinator, and was removed from eligibility for a step promotion.

54.     Plaintiff suffered further adverse tangible employment action when he was "terminated" notwithstanding his timely request for a pre-determination hearing, after which time he was suspended and placed on administrative leave, and not permitted to return to work.  This deprived Plaintiff of his livelihood and materially affected his current and future employment.

55.     Plaintiff's wrongful termination is a separate and distinct instance of an adverse tangible employment action

56.     Plaintiff has been made to suffer mental anguish and emotional distress, loss of wages and benefits, elimination of job functions of authority, suspension from employment, and ultimately loss of employment and future employment opportunities, as a direct and proximate result of Defendant's violations of his statutory rights as alleged herein. Plaintiff is entitled to the

rights and remedies provided by law including statutory and compensatory damages, compensation for lost wages, costs, pre-judgment interest, and reasonable attorney's fees.

## COUNT III: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §12101, *et. seq*.

57.     All preceding paragraphs are fully incorporated herein.

58.     Plaintiff was unlawfully discriminated against by Defendant on the basis of his disability.  Defendant refused to engage in a meaningful dialogue and did not provide him with reasonable accommodations.  At the time and after Plaintiff filed a formal Complaint, Plaintiff was subjected to materially adverse employment action.  There was a causal connection between Defendant's decision to issue Plaintiff written reprimands, place him on a PIP plan, and ultimately to terminate him, and Plaintiff's protected status as a person with autism.

59.     Defendant further engaged in retaliatory conduct by increasing the pressure on Plaintiff and setting him up to fail in a manner that would give the appearance of justifying disciplinary measures.  In actuality, these were baseless complaints aimed at forcing Plaintiff to resign or otherwise to dissuade him from pursuing his discrimination claim any further.

60.     Defendant did not provide a credible, reasonable, non-discriminatory purpose for engaging in these activities.

61.     As a direct and proximate result of Defendant conduct, Plaintiff has been made to suffer mental anguish and emotional distress, loss of wages and benefits, loss of employment and future employment opportunities. Plaintiff is entitled to the rights and remedies provided by law including statutory and compensatory damages, costs, pre-judgment interest, and reasonable attorney's fees.

## COUNT IV: WRONGFUL TERMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §12101, *et. seq*.

62.     All preceding paragraphs are fully incorporated herein.

63.     Plaintiff was unlawfully discriminated against by Defendant on the basis of his disability.  Defendant refused to engage in a meaningful dialogue and did not provide him with reasonable accommodations.  At the time and after Plaintiff filed a formal Complaint, Plaintiff was subjected to materially adverse employment action.  There was a causal connection between Defendant's decision to issue Plaintiff written reprimands, place him on a PIP plan, and ultimately to terminate him, and Plaintiff's protected status as a person with autism.

64.     Defendant further engaged in retaliatory conduct by increasing the pressure on Plaintiff and setting him up to fail in a manner that would give the appearance of justifying disciplinary measures.  In actuality, these were baseless complaints aimed at forcing Plaintiff to resign or otherwise to dissuade him from pursuing his discrimination claim any further.

65.     As a direct and proximate result of Defendant conduct, Plaintiff has been made to suffer mental anguish and emotional distress, loss of wages and benefits, loss of employment and future employment opportunities. Plaintiff is entitled to the rights and remedies provided by law including statutory and compensatory damages, costs, pre-judgment interest, and reasonable attorney's fees.

## COUNT V: DELAWARE PERSONS WITH DISABILITIES EMPLOYMENT PROTECTIONS ACT  19 DEL. C. §§720-728

66.     All preceding paragraphs are fully incorporated herein.

67.     Plaintiff is a qualified person with a disability within the meaning of the DPDEPA. Defendant violated his statutory rights under State law to be free from discrimination and retaliation on the basis of his disability, and wrongfully discharged him without due process or an opportunity to engage in a discussion concerning what reasonable accommodations could be afforded to him.

68.     As a direct and proximate result of Defendant's conduct, Plaintiff has been made to suffer mental anguish and emotional distress, loss of wages and benefits, loss of employment and future employment opportunities. statutory and compensatory damages, costs, pre-judgment interest, and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Honorable Court will grant her relief in the form of the following:

A.     Actual and compensatory damages;

B.     Statutory damages including fee-shifting;

C.     Costs, including pre- and post-judgment interest;

D.     Attorney's Fees;

E.     Any other such declaratory and injunctive relief as this Court deems appropriate and just.

Respectfully Submitted,

/s/Kate Butler
Bar ID No. 6017
Law Offices of Kate Butler, Esq.
1509 Gilpin Avenue, Suite 3
Wilmington, DE 19806
(302) 966-9994 (tel)
(302) 651-7960 (fax)
Date:  December 4, 2019        *Attorney for Plaintiff*